James D. Greene, Esq., NV Bar No. 2647          E-filed on: *July 7, 2016*
**GREENE INFUSO, LLP**
3030 South Jones Boulevard, Suite 101
Las Vegas, Nevada 89146
Ph: (702) 570-6000
Fax: (702) 463-8401
E-mail: jgreene@greeneinfusolaw.com

Wendy Medura Krincek, Esq. Bar No. 6417
**LITTLER MENDELSON, P.C.**
3960 Howard Hughes Parkway
Suite 300
Las Vegas, Nevada 89169-5937
Ph: (702) 862-8800
Fax: 702-862-8811

Attorneys for Plaintiffs

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>MARC JOHN RANDAZZA<br><br>          Debtors.<br>_____<br>EXCELSIOR MEDIA CORP., a Nevada Corporation; and LIBERTY MEDIA HOLDINGS, LLC, a Nevada Limited Company,<br><br>          Plaintiffs,<br><br>V.<br><br>MARC JOHN RANDAZZA, an individual,<br><br>          Defendant. | Case No BK-15-14956-ABL<br><br>Chapter 11<br><br><br>Adversary Proceeding No. 15-01193-ABL<br><br><br><br>**SECOND AMENDED COMPLAINT BY CREDITORS EXCELSIOR MEDIA CORP., AND LIBERTY MEDIA HOLDINGS, LLC TO DETERMINE NON-DISCHARGEABILITY OF DEBTS**<br><br>**Hearing Date:  N/A**<br>**Hearing Time: N/A** |

Plaintiffs Excelsior Media Corp. ("Excelsior") and Liberty Media Holdings, LLC., ("Liberty" and, collectively with Excelsior, "Plaintiffs" or "E/L"), by and through their counsel, James D. Greene, Esq., of Greene Infuso, LLP, hereby file this Second Amended Complaint

1

objecting to the dischargeability of debts pursuant to 11 U.S.C. §523(a)(2)(A), §523(a)(4) and §523(a)(6) (the "SAC").  Plaintiffs allege and state as follows:

## I.   JURISDICTION AND VENUE

1.      This Court has jurisdiction of this matter under 28 U.S.C. §157 and 11 U.S.C. §523.  The claims for relief alleged in this complaint arise under Title 11 of the United States Code and are related to a case pending in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court").  The pending bankruptcy case to which the claims for relief alleged in this Complaint are related is *In re Marc John Randazza*, Bk Case No. BK-S-15-14956-abl (the "Randazza Case").

2.      The determination of dischargeability is a core proceeding under 28 U.S.C. §157(b).  Regardless of whether this is a core proceeding, consent is hereby given to the entry of final orders and judgment by the Bankruptcy Court.

3.      Pursuant to 28 U.S.C. §1409, venue is proper in the District of Nevada, because the Randazza Case is pending in this district and division.

## II.   THE PARTIES

4.      Excelsior is a Nevada corporation doing business primarily in Clark County, Nevada.

5.      Liberty is a Nevada limited liability company doing business primarily in Clark County, Nevada.

6.      Upon information and belief, Defendant Marc John Randazza ("Defendant" or "Randazza") is a resident of Clark County, Nevada and is the debtor in the Randazza Case.

## III.   GENERAL ALLEGATIONS

7.      Defendant Randazza is the former in-house General Counsel of E/L.  Randazza was employed as E/L's General Counsel continuously from June, 2009 until August 2012.

8.      Excelsior is a sister company to various entities including Liberty and Corbin Fisher.  Corbin Fisher is an on-line entertainment website and brand name whose intellectual property is owned by Liberty.  Excelsior is a film production company that creates videos for the Corbin Fisher brand.  E/L has consistently endeavored to and succeeded at conducting its business

**GREENE INFUSO, LLP**
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

2

in a principled and professional manner. E/L relocated its headquarters from San Diego, California to Las Vegas in February 2011.

9.  Randazza also relocated from San Diego, California to Las Vegas in 2011 to continue his employment relationship with E/L. Randazza markets himself as a "specialist" in First Amendment and intellectual property law, particularly with regard to the adult entertainment industry.

10. E/L and Randazza became acquainted while Randazza was an associate at a firm specializing in First Amendment related legal work in Florida. E/L later decided to hire a General Counsel. Randazza pursued and accepted the position. Randazza drafted an employment agreement, which was executed by the parties in June, 2009 ("Employment Agreement"). Randazza at no time advise Plaintiffs that they should seek independent counsel to review the agreement even though Plaintiffs were obviously unrepresented. During the course of his employment with E/L, Randazza was an integral part of E/L's management and, along with several other executives, participated in making many of E/L's major corporate decisions.

11. The primary reason E/L decided to hire a General Counsel was to ensure its intellectual property was protected. One of the most significant challenges faced by E/L and all companies in the film and entertainment industry is the illegal downloading and sharing of content/videos produced by E/L. However, Randazza was tasked with handling all of E/L's legal matters.

**A.    THE EMPLOYMENT AGREEMENT**

12. Pursuant to the Employment Agreement, Randazza was to wind down his private practice during his first 90 days of employment and become E/L's full-time General Counsel.

13. Section "6.C" of the Employment Agreement permitted Randazza to continue to provide professional services to a "limited number of outside clients" during non-working hours if such work did not present a conflict of interest for E/L. Contrary to his obligations under the Employment Agreement and without the knowledge of E/L, Randazza continued to aggressively grow his private practice during his employment after becoming E/L's General Counsel.

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

3

14.     Randazza's compensation consisted of an annual salary of $208,000.  Randazza also included in the Employment Agreement the unique arrangement of a nondiscretionary bonus of 25% of any settlement funds paid to E/L.

15.     At the time of the execution of the Employment Agreement, the parties contemplated that Randazza would be handling all of E/L's legal matters independently.  Instead, Randazza began to utilize his own firm, Randazza Legal Group ("RLG") and various outside counsel to assist in E/L's legal matters.

16.     The Employment Agreement also required that E/L provide Randazza with a laptop computer and PDA/phone, which were to be primarily used for E/L business with only occasional and incidental personal use permitted.  The Employment Agreement further provided that such equipment was not to be used for professional services rendered to other clients.

17.     The Employment Agreement provided for severance in the amount of 12 weeks of salary if E/L were to unilaterally terminate Randazza in the fourth year of employment or later.  There is no severance obligation if Randazza resigned or was terminated for cause.

18.     The Employment Agreement also includes a governing law provision stating "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to conflict of laws."  Randazza was able to reside virtually anywhere he wanted.  Initially, Randazza lived and worked in San Diego, California.  However, Randazza relocated to Las Vegas, Nevada in June 2011, just as few months after E/L relocated its headquarters.

19.     At Randazza's request, E/L hired Erika Dillon ("Dillon"), a paralegal.  Dillon was employed by E/L as a paralegal at the time of Randazza's resignation. Dillon left her employment after Randazza's resignation at Randazza's request

**B. ISSUES ARISE BETWEEN E/L AND RANDAZZA**

      **i.     Randazza's Non-E/L Work**

20.     As noted above, under the Employment Agreement Randazza was obligated to wind down his private practice during the first 90 days of his employment with E/L.

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

4

**GREENE INFUSO, LLP**
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

21.    After becoming E/L's General Counsel, however, Randazza kept adding clients to his practice, RLG, and over the period from October 2009 through August 2012, he billed over 1,643 hours to clients for work unrelated to E/L (and not including pro bono work). This amounts to an average of 47 hours per month. During Randazza's employment at E/L, he never billed less than 14.5 hours in a given month to other clients and in many months he billed between 50 and 90 hours to such clients. During the period from September 2011 through January 2012, Randazza billed 390.65 hours to non-E/L and non-pro bono clients, an average of over 78 hours per month. This pattern of extensive and increasing work for non-E/L clients is evidence that Randazza had no intention of winding down his private practice as required by the Employment Agreement.

22.    During his employment with E/L, including during the period from September 2011 through January 2012, E/L paid Randazza's full salary and benefits, including bar dues in multiple jurisdictions.

### ii.    Randazza's TNAFlix Relationship

23.    Randazza, through RLG, represented Liberty in a lawsuit that he filed in the United States District Court for the Southern District of California against TNAFlix ("TNA") (Case. No. 10-CV-1972-JHA-POR) alleging that TNA (a file-sharing website) infringed Liberty's copyrighted works (the "TNA Matter"). Valentin Gurvits, Esq. ("Gurvits") of the Boston Law Group, LLP ("Boston Law") represented TNA.

24.    In December 2010 and January 2011, Randazza and Gurvits negotiated a settlement of the TNA Matter. During the course of those negotiations, Gurvits raised a concern about his client (TNA) being sued by other copyright owners in the future based on the same or similar allegations made by Liberty against TNA in the TNA matter.    In an email dated December 7, 2010, Randazza advised Gurvits that he "could largely prevent other plaintiffs from entering the fray."

25.    According to Randazza, Gurvits wanted to pay Randazza a "fee" of $5,000 in order to conflict Randazza out of future cases against TNA. In an email dated December 22, 2010, Randazza responded to Gurvits' offer as follows:

5

> As far as conflicting me out of future cases, that will require significantly more than $5,000.  In fact, I have someone waiting in the wings with a $50k retainer right now.

> Naturally, I'm in a strange ethical bind, as your offer to conflict me out of future cases against your client is something that would benefit my current client.  Accordingly, I would be willing to be conflicted out of cases against TNA, but that $5k figure has to come up.  Either that, or you can give [Liberty] what they asked for, and I'll conflict myself out for a token payment.

26.   Randazza and Gurvits continued to discuss the prospect of conflicting Randazza out of future cases against TNA during the course of negotiating a settlement of the TNA Matter. For example, on January 11, 2011 Randazza wrote in an email to Gurvits:

> Keeping me out of the TNA game is a little more complicated.

> If your client wants to keep me personally out of the TNA game, then I think that there needs to be a little grave for me.  And it has to be more than the $5k you were talking about before, I'm looking at the cost of at least a new Carrera in retainer deposits after circulating around the adult entertainment expo this week.  I'm gonna want at least used BMW money.

> In order to conflict me out of future matters, I suggest this:

> Your firm retains me as "of counsel" to you.  I get $5k per month (for six months) paid to me, from you (TNA will reimburse you, I presume).  I will render advice on TNA and TNA only, and I'll be Chinese walled from your other clients so that other conflicts are not created.

> ********************************

> That way, I'm adequately compensated for my loss of major potential work, and I'm conflicted out of acting adversely to TNA.

27.   On January 12, 2011, Randazza apparently discovered that he was ethically prohibited from discussing limitations on his right to practice law during the course of settlement negotiations on behalf of a client, and sent an email to Gurvits saying that he could no longer discuss it, saying: "But I'm certain now that such an arrangement is unethical, in the terms we've been discussing it."   Nevertheless, Randazza recommended finding "some other way of addressing [TNA's] interests," and stated as follows:

> Like I said before, if TNA wants to hire me *after* settlement, on terms that we discuss *after* settlement, then my phone line will be open.

6

> However, it seems that if we place any part of a "buyoff" as a condition of settlement, then all four of us could wind up in bar trouble. I'm certainly not risking it.

28.     On February 1, 2011, Liberty signed a Settlement Agreement and General Release of Claims (the "TNA Settlement Agreement") under which Liberty agreed to dismiss its claims against TNA without prejudice in exchange for payment of fifty thousand dollars ($50,000.00). The next day (February 2, 2011) and before Randazza had even received the signature of Gurvits' client on the TNA Settlement Agreement and the sameday that Randazza received the settlement payment from TNA, Randazza sent an email to Gurvits asking if TNA wanted "a retainer letter form [him]."

29.     On February 11, 2011 Randazza emailed Gurvits a draft retainer letter from TNA to sign, which required a $36.000.00 retainer to be paid at the outset of the representation and deemed to be earned upon receipt. TNA did not, however, immediately sign the retainer letter, Randazza wrote to Gruvits in late June 2011 stating, "You will recall that I am not conflicted out of representing another client against [TNA]."

30.     Randazza did not disclose to E/L the fact that he was discussing the prospect of either receiving a payment directly from TNA as part of settling the TNA Matter or, alternatively, being retained by TNA immediately after settlement in order to conflict him out of further cases against TNA.

31.     On December 30, 2010, Randazza emailed Gurvits to inform him that another client of his was interested in acquiring TNA. Randazza further stated:

> This puts me in a weird position, I think, But, I believe that if TNA is interested in such discussion, that I can orchestrate an ethical way for us to manage that. May as well ask them if they would have an interest. If so, you and I can figure out how to ethically work on such a transaction. I'd imagine that you personally could earn a shitload more money for a broker fee that you'd be earning litigating this case (and me as well).

32.     In another email sent by Randazza to Gurvits on December 30, 2010, he hypothesized about how to avoid the obvious conflict:

> Here's how I think we could do it- and I think that I have more ethical pitfalls than you. I'd have to reveal to Liberty that this was going on, and

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

> I think that a settlement with [Liberty] would have to be part of the deal. But I think that we could do it so that the settlement would be paid only after the sale- so that there was no suspicion on [TNA]'s part that this was any sleight of hand on my part to just get Liberty a settlement.

33.    On January 11, 2011, Randazza and Gruvits continued to discuss the potential acquisition of TNA.  Randazza suggested that each of them split a fifteen percent (15%) broker's fee for "put[ting] the deal together."  He further stated:

> And, to make the deal go smoothly- we are going to need to kill off the case.  If you put together a $2mil to $5mil deal, or even a $1mil deal, the money we are talking is on the toilet seal, and we shouldn't let that queer the deal…

34.    In response, Gurvits wrote that he did not want to "muddy the waters with the possible sale," and that, "[i]f the case can be settled, we should settle it without reference to the sale."

35.    On January 20, 2011, Gurvits wrote an email to Randazza in which he stated that he was "concerned about ethical issues that arise if these two things are connected," and asked to finish the case "one way or another, and then move on to the sale."  Randaza agreed, but he also wrote in a response email to Gurvits as follows: "But I wouldn't be so cavalier about saying $50k, take it or leave it' with that plane flying around."

36.    On February 2, 2011 which, as stated above, was before Randazza had received the signature of Gurvits' client on the TNA Settlement Agreement and the same day that Randazza received the settlement payment from TNA, Randazza asked Gurvits about preparing a broker agreement related to the sale.

37.    By February 14, 2011 Randazza was getting anxious about brokering the sale of TNA, and emailed Gurvits as follows:

> Tell them this:  That Liberty settled this thing super cheap, and that I honestly think this was a $750k case if we went all the way.  But, we do what our clients tell us to do.
>
> The next company lining up has a big litigation plan, and I can assure you, they won't settle cheap.  I am close friends with them- but did not encourage them to get in this thing.  They sent me a draft complaint today, and they have only held off on filing it because I begged them to wait.

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

8

> If TNA can't [make a decision], I can't hold these guys back any longer.
>
> I'm not holding them back out of Christian charity.  I'm holding them back because I can probably broker a deal where they get a little something out of the sale, and save the sale.
>
> But, if we don't have a broker agreement in place, I can't blow my wad holding this suit back.  And this suit will make them worth about 10% of what they are worth now.
>
> I realize they are probably not the best communicators – I have similar clients.  But, if you've got a way to shake them up, please do so…you and me stand to lose a fat commission.

38.   On February 15, 2011, Randazza emailed Gurvits a draft broker agreement (which Randazza had already signed).  However, later that same morning, Mr. Randazza wrote another email to Gurvits advising that they were "screwed" because his other client was filing its lawsuit against TNA the next day.

### iii.   Randazza's Bang Bros. Dealings

39.   After being hired as Plaintiffs' General Counsel Randazza represented Bang Bros, a competitor of Plaintiffs.  Randazza billed approximately 79 hours to Bang Bros while he was representing Excelsior and Liberty.

40.   In or around June 2012, Liberty was negotiating a potential acquisition of Cody Media, Inc. ("Cody Media"), a large producer of adult entertainment videos, for $5,500,000.00.  Liberty intended to finance the acquisition through one or more third-parties.  Randazza was integrally involved in the potential acquisition of Cody Media.

41.   Randazza suggested that E/L obtain financing from Bang Bros to acquire Cody Media, but he deliberately failed to advise Liberty that he also represented Bang Bros and even though he knew borrowing money from Bang Bros. (who is a competitor of E/L) could harm E/L.

42.   Liberty did not proceed with the acquisition of Cody Media.

### iv.   Randazza's XVideos and XNXX Dealings

43.   After being hired as Plaintiffs' General Counsel, Randazza was retained by an entity that owns two pornographic websites, XVideos and XNXX, which were frequent litigation

**GREENE INFUSO, LLP**
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

targets as infringers of Plaintiffs' copyrighted films. Randazza billed over 100 hours to XVideos while he was Plaintiffs' General Counsel.

44.    In January 2011, Liberty contemplated once again suing XVideos for copyright infringement. Randazza was reluctant to do so. In an email to Excelsior, dated January 17, 2011, Randazza indicated that he had previously advised XVideos to implement a system for detecting unauthorized uploads of copyrighted works onto its website, which would present a strong defense to copyright infringement claims, but did not acknowledge outright that he represented them. Randazza then noted that it would present an "ethical problem" for him to sue XVideos. No further details were contained in the email and Plaintiffs did not realize that XVideos was Randazza's client.

45.    Because Liberty was contemplating suing XVideos, Randazza called XVideos to advise it that he could not represent it in an upcoming dispute with Liberty. Randazza did not have authority to disclose E/L's intent to sue XVideos to XVideos.

46.    In September 2011, Liberty again contemplated suing XVideos and XNXX for copyright infringement. Randazza advised against that proposed course of action, claiming that XVideos' use of Liberty's content was "fair use," and thus, protected under federal law. He indicated that Liberty would look bad from a publicity standpoint for bringing a claim against XVideos and advised against sending it a DMCA takedown request.

47.    Even when specifically requested to sue XVideos and XNXX, Randazza deliberately failed to disclose his concurrent representation of those entities.

48.    Randazza deliberately failed to disclose that he represented XVideos despite knowing that failing to enforce E/L's rights against XVideos would harm E/L by failing to collect monetary damages and by impairing its ability to protect its intellectual property rights in the future.

### v.    Randazza's Oron Dealings

49.    Randazza had filed suit on behalf of E/L in the U.S. District Court of Nevada and in Hong Kong against an Internet file-locker website, Oron.com ("Oron"), asserting copyright infringement claims arising out of Oron's facilitation of the illegal downloading of E/L content.

Randazza and counsel for E/L in Hong Kong obtained a preliminary injunction on behalf of E/L preventing Oron from disbursing any of its Hong Kong based assets.

50.     After extensive negotiations, in which E/L's CEO, Jason Gibson ("Gibson"), was involved, on July 1, 2012, E/L and Oron executed a settlement agreement which provided for payment by Oron to Excelsior of $550,000.

51.     Pursuant to the settlement agreement, $550,000 was to be transferred to the RLG trust account and Randazza agreed to be personally liable if the funds were prematurely disbursed (before all terms were complied with), including being responsible for a 10% penalty.

52.     Oron later claimed the settlement agreement was not enforceable.   E/L sought the intervention of the district court and obtained an order declaring the settlement agreement to be valid and enforceable as a judgment against Oron.

53.     After the entry of the order declaring the settlement agreement to be enforceable, Randazza engaged in further settlement negotiations with Oron's counsel to resolve both the Hong Kong proceeding and address the judgment/order issued by the District Court of Nevada. On August 13, 2012, Randazza presented Gibson, with a new Oron settlement agreement.  The settlement agreement provided for a payment of $600,000 to E/L to be held in trust until various provisions of the settlement agreement were preformed.  However, the settlement agreement also provided for payment of $75,000 to Randazza.  There were no restrictions upon disbursement of Randazza's payment.

54.     Randazza did not inform Gibson that the settlement offer by Oron was only valid until August 14, 2012.

55.     Upon review of the settlement agreement, Gibson discovered the provision calling for a payment of $75,000 to Randazza.  Randazza had not previously disclosed this provision to Gibson and did not obtain Gibson's authority or consent to negotiate or include such a provision. The payment to Randazza immediately raised questions for Gibson as did the nervous manner in which Randazza presented the agreement to him.  In response to Gibson's inquiry regarding the $75,000 payment, Randazza characterized it to be a "bribe" to his firm for a promise not to sue Oron again.  When Gibson questioned why that payment should not go to the E/L, Randazza

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

claimed Oron had specifically taken the position that not a penny more than $600,000 could go to E/L.

56.     Randazza's entire explanation did not make sense to Gibson, nor did Randazza's self-dealing sit well with E/L.  Gibson advised Randazza that he was not comfortable with the $75,000 payment given that Randazza was already being compensated by E/L for his work on the matter and that it seemed illogical that Oron would care whether all of the $675,000 it was willing to pay went to E/L or not.

57.     E/L's concerns with Randazza grew significantly because of this incident.  Over the succeeding weeks, Randazza made various attempts to discuss the "bribe" in an effort to obtain Gibson's consent to include it in the settlement agreement.  Gibson rebuffed Randazza's efforts having determined it was best to closely consider the quality of Randazza's work for E/L.

58.     Randazza reacted strongly to Gibson's refusal to address the term of the settlement agreement.  Following a happy hour event during this time period, Randazza began cleaning personal items out of his office and loudly saying "F**ck this shit, I quit."

59.     In late August, 2012, Gibson learned from outside counsel in Hong Kong that the $550,000 settlement payment from Oron had been received by Randazza into his firm's trust account without notification to Gibson.  Randazza had previously notified the executive team as soon as settlement monies were received touting his successes.

60.     Gibson questioned Randazza about the delay and Randazza responded claiming the delay was due to the money finally being released late the day before.  Gibson indicated E/L's desire to move forward with fulfilling the conditions of settlement such that the $550,000 could be immediately released to E/L and also expressed displeasure with the fact that E/L likely would only receive about $262,500 of the total settlement amount once fees, costs, and Randazza's 25% bonus were taken into account.

61.     Randazza refused to comply with Gibson's directive, stating that he was not forwarding the $550,000 and instead, "I'm taking out my share, the costs we owe to outside parties, and paying myself back the $25,000 I advanced.  Then I'm giving you your net, which is more than you expected."  In other words, Randazza was unilaterally taking control of the

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

settlement funds. E/L found this to be completely inappropriate but was at a loss as to how to rectify the situation as the money was in Randazza's trust account over which it had no control.

62.    Only a couple of hours later, Randazza communicated the following to E/L: "Given our now openly adversarial relationship, it seems appropriate that I withdraw from representing Liberty in any further matters. There might be a way I can continue to wind down existing matters, but it's going to require a call to discuss it. When are you free?"

63.    E/L communicated to Randazza that it construed his email as a resignation, which it accepted effective immediately, instructed that neither he nor RLG touch the Oron settlement funds, advised it had retained new counsel, Littler Mendelson, and further instructed that Randazza retain all E/L property in its possession for the time being. E/L then promptly paid Randazza his salary through his last day of employment and accrued, unused PTO.

### vi.    The Aftermath of Randazza's Resignation

64.    After Randazza's resignation, E/L learned that without its knowledge or consent, Randazza had begun storing all of E/L's legal records on the RLG server to which only he and the paralegal had access. Immediately after resigning, Randazza cut off all E/L access to its legal records and refused to grant E/L any access to, or copies of, its records. In addition, E/L had no access to records regarding legal settlements or agreements with vendors and outside counsel that were engaged in its legal matters.

65.    Since his resignation, Randazza has continually engaged in conduct designed to make E/L's life difficult while at the same time attempting to portray a facade of being conciliatory. E/L's paralegal Erika Dillon informed the Human Resources Manager that Randazza was pressuring her to leave E/L to work for Randazza's outside firm. On the day of Randazza's resignation, but prior to his resignation email being sent, Randazza and Dillon plotted to delete and wipe information from computer hard drives and cut-off E/L's access to its records in anticipation of their resignations.

Randazza further engaged in the following conduct:

a.    The day he resigned, Randazza contacted Hong Kong counsel and informed them he was no longer counsel for E/L because E/L refused to pay his or the Hong Kong firm's fees.

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

This blatant falsehood was calculated to cause harm to E/L.  In corresponding with the Hong Kong firm, E/L learned Randazza had not disclosed to them that he was General Counsel for E/L. E/L had to immediately wire approximately $33,000 to the Hong Kong firm in order for the firm to continue representing E/L because of their unease over Randazza's improper communication.

b.      Randazza also began contacting other outside counsel attempting to influence them to withdraw from representation of E/L.   On August 20th, local counsel for litigation in Philadelphia informed E/L that he had been contacted by Randazza about Randazza's departure and requested to withdraw as counsel for E/L.

c.      On September 4, 2014, when Randazza knew E/L's CEO was out of state, Randazza and Dillon appeared unannounced at E/L's headquarters despite knowing this was not something that E/L would tolerate from an ex-employee.   Caught off-guard, the Human Resources Manager allowed Randazza access to his office.

d.      After prodding, Randazza eventually returned his company owned laptop, but not without first wiping the computer several times.  In fact, Randazza wiped his laptop the day before his resignation.   Randazza was informed in writing to retain all E/L property in his possession and E/L subsequently sent Randazza a formal preservation notice.   As an attorney, Randazza knows he is not permitted to spoliate evidence, but he deliberately chose to do so in an effort to harm E/L in litigation he knew was on the horizon.

e.      E/L has further learned that Randazza attempted to coerce at least one former employee to provide unfavorable testimony against E/L in the parties underlying arbitration, again in a deliberate effort to harm E/L.   Fortunately, that former employee alerted E/L to the duress he was being placed under by Randazza.

66.     Randazza subsequently commenced an arbitration proceeding through JAMS against Excelsior asserting claims for breach of the Employment Agreement.  Plaintiffs asserted counterclaims in the Arbitration.   After approximately two years of litigation and a 5-day arbitration hearing, the arbitrator issued a decision in favor of Plaintiffs and rejecting all of Randazza's claims.

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

## C. E/L LEARNS OF MULTIPLE UNETHICAL ACTS RANDAZZA ENGAGED IN DURING HIS EMPLOYMENT

67.     Randazza involved his lawfirm, RLG, in the Oron litigation.  Randazza never had E/L enter into any form of fee agreement with RLG as any prudent General Counsel would and should.  Randazza often asserted to E/L that when he used RLG, he would not make money on his firm's work and E/L would only have to pay a highly discounted hourly rate reflecting RLG's direct costs incurred for the labor.  In short, E/L was never to be charged the customary hourly rates of RLG attorneys.  Nor, would it ever have incurred charges of $500 per hour for Randazza's time as he was an employee of E/L.  With that in mind, Randazza and his firm filed a Motion for Attorneys Fees and Costs in the Oron matter.  In the Motion, Randazza represented to the court that E/L had incurred/expended approximately $134,000 in attorneys fees and costs.

68.     Unbeknownst to E/L, Randazza misrepresented to the court that it paid Randazza and RLG their standard rates to the tune of $134,000, and that E/L was receiving regular billing from RLG.  A review of Randazza's filings in other matters show this is not the first time such misrepresentations have been made.  E/L discovered these misleading statements during the process of locating new counsel.

69.     Discovery in the underlying arbitration between the parties has also confirmed that throughout the course of Randazza's employment with E/L, he engaged in unethical conduct, and the representation of various companies that created conflicts of interest in light of his employment as E/L's General Counsel.  Some of this conduct is described above.  The full extent of Randazza's conflicts remain unknown as E/L does not have knowledge of Randazza's full and complete client base.

70.     As described above, on multiple occasions, Randazza also engaged in negotiations with adverse parties who had litigation pending against E/L, regarding those parties retaining his services in order to conflict him out from any future cases against them.  In fact, Randazza improperly engaged in those negotiations during E/L's litigation with TNAFlix, Oron, and Megaupload.

GREENE INFUSO, LLP<br>3030 South Jones Boulevard Suite 101<br>Las Vegas, Nevada 89146<br>(702) 570-6000

15

71.    Also, as described above, Randazza also negotiated to potentially broker a deal for the sale of TNAFlix while actively litigating against them on E/L's behalf, he encouraged E/L to enter into an unethical business transaction during the Oron litigation, jeopardized the entire Oron settlement as a result of his unethical behavior and explicit non-compliance with the settlement agreement, and encouraged E/L to enter into agreements with vendors he represented without any disclosure therefor.  Randazza never disclosed the existence of any of these conflicts of interest and never sought written informed consent from E/L.

### III.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

(For Determination of Non-Dischargeability of Debts under 11 U.S.C. §523(a)(2)(A) - False Pretenses, False representation, or Actual Fraud)

72.    Plaintiffs hereby incorporate by reference each and every allegation stated hereinabove as though fully set forth herein.

73.    In or about the year 2009, Defendant Randazza represented and induced Plaintiffs to enter into the Employment Agreement, as alleged above with the implied and actual promise that if they entered into the Employment Agreement, Defendant would act in accord with all duties, fiduciary or otherwise, inherent in the position of employee/executive/principal as well as in accord with the heightened duties, fiduciary and otherwise, inherent in his position as attorney and in-house General Counsel to E/L.  During the course of his employment with E/L as in-house general counsel, employee, principal, and executive, as well has his fiduciary duties, Randazza owed a duty to disclose to E/L.

74.    At the time he entered into the Employment Agreement, Defendant did not intend to carry out its term or to comply with the terms of that Agreement.

75.    Despite knowing he had no intention to carry out the terms of the Employment Agreement, Defendant deliberately failed to disclose his intentions to Plaintiffs so as to induce Plaintiffs to enter into the Employment Agreement.

76.    As Plaintiffs' General Counsel, Defendant had an affirmative duty to disclose to Plaintiffs all facts material to his work on their behalf and to keep Plaintiffs fully apprised of his

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

activities.  Plaintiffs relied on Defendant's full disclosures in making decisions regarding their operations of the companies and in continuing their relationship with Defendant.

77.    Defendant's deceptive conduct includes his failure to disclose to Plaintiffs various facts material to his work and to his continued employment including:  the true nature of his dealings with infringers of Plaintiffs intellectual property; his engagement in negotiations with adverse parties who had litigation pending against Plaintiffs, regarding those parties retaining his services in order to conflict him out of any future cases against them; his negotiations to broker a deal for the sale of an infringement defendant (TNAFlix) while actively litigating against them on EL's behalf; his deliberate failure to wind down his law practice and, in fact, his expansion of that practice, which included his undertaking representation of parties whose interests were adverse to Plaintiffs' interests.

78.    Defendant was well aware of the deceptive nature of his conduct as described in the preceding paragraph and elsewhere in this complaint.

79.    Had Plaintiffs been aware of the true facts and circumstances, Plaintiffs would not have taken Defendant's advice on any matter, would not have acceded to the payments made to Defendant by Plaintiffs or by the various third parties, would have immediately terminated Defendants' employment for cause and would not have contributed any time, money, or labor to the fulfillment of the Employment Agreement, or paid the substantial amounts comprising Randazza's compensation.

80.    At the time Defendant made such representations and committed the nondisclosures and other deceptive conduct, he did so with the intent to deceive Plaintiffs.

81.    At the time Defendant made the representations that he would live up to the terms of the Employment Agreement when he, and committed such nondisclosures, the representations was false, and he knew that they were false, and/or purposefully did not disclose said facts in that he intended to act for the sole benefit of himself, and at the detriment of E/L.

82.    Plaintiffs justifiably relied upon Defendant's representations that he would carry out his duties as Plaintiff's General Counsel by agreeing to enter into the Employment Agreement.

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

83. Plaintiff justifiably relied upon Defendant's misrepresentations and deliberate omissions by carrying out their obligations under the Agreement, including paying Defendant's salary, benefits, bonuses, bar expenses and other charges.

84. As a result of the false representations of Defendant, Plaintiffs have been damaged in an amount exceeding $1,000,000. Plaintiffs are also entitled to an award in the amount of the compensation paid to Defendant in reliance on his fraud and deceptive conduct as alleged herein as well as the attorneys fees and costs incurred in connection with the pre-petition arbitration and punitive damages against Defendant in an amount according to proof at trial.

85. Plaintiffs therefore seek an order under 11 U.S.C. §523(a)(2)(A): (1) determining: (i) Defendant is liable to Plaintiffs in an amount to be proved at trial herein; and (ii) that said liability is non-dischargeable; and (2) awarding attorneys' fees and costs incurred by Plaintiffs in connection with the prosecution and defense of the pre-petition arbitration.

## SECOND CLAIM FOR RELIEF

(For Determination of Non-Dischargeability of Debts under 11 U.S.C. §523(a)(4) - Fraud or Defalcation while acting in a Fiduciary Capacity)

86. Plaintiffs hereby incorporate by reference each and every allegation stated hereinabove as though fully set forth herein.

87. Defendant breached those duties by all of the acts and omissions alleged above including, but not limited to, willfully violating the Employment Agreement, engaging in willful conflicts of interests at the expense of Plaintiffs, benefitting himself at the expense of Plaintiffs, committing acts of legal malpractice, making false representations, spoliation and destruction of evidence, failing to account for or pay over to Plaintiffs funds belonging to them and converting Plaintiffs funds and property.

88. Pursuant to the terms of the Employment Agreement, an express trust was created between Randazza and Plaintiffs as to funds paid to him or held by him on behalf of Plaintiff. With respect to such funds, Randazza was a fiduciary and owed Plaintiffs the highest possible duty of care, including the obligation to turn over such funds to Plaintiffs.

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

89.     With respect to the Oron funds paid to Defendant as descried above, Defendant failed to account for or to pay over to Plaintiffs such funds.  As such, Defendant committed a defalcation as to Plaintiffs with respect to such funds.

90.     In June of 2012, Defendant also received $5,000 from James Grady ("Grady Funds") to help fund fees and costs related to the Oron litigation, which funds rightfully belonged to Plaintiffs.

91.     Defendant held the Grady Funds in trust for Plaintiffs subject to the express trust created under the Employment Agreement.

92.     Defendant never turned over or accounted to Plaintiffs for the Grady Funds and thus committed a defalcation with respect to such funds.

93.     During his employment by Plaintiffs, Defendant filed a lawsuit against Righthaven on behalf of a third-party client on a pro bono basis ("Righthaven Suit").

94.     Plaintiffs were aware of and did not object to Defendant handling the Righthaven suit.

95.     Throughout the time Righthaven case was pending, Defendant was employed as Plaintiffs' General Counsel and was being compensated by Plaintiffs.

96.     Unbeknownst to Plaintiffs, Defendant was awarded approximately $55,000 in attorneys' fees ("Righthaven Award").

97.     Defendant held the funds from the Righthaven Award subject to the express trust created under the Employment Agreement.

98.     Defendant committed a defalcation as to the Righthaven Award by failing to disclose the payment of such funds to him and by failing to turn such funds over to Plaintiffs.

99.     As a direct and proximate result of Defendant's breaches of his fiduciary duties, Plaintiffs have suffered damages in an amount to be determined at trial.

100.    Plaintiffs therefore seek an order under 11 U.S.C. §523(a)(4): (1) determining that: (i) Defendant is liable to Plaintiffs in an amount to be proved at trial herein; and (ii) said liability is non-dischargeable; and (2) awarding attorneys' fees and costs incurred by Plaintiffs in connection with the prosecution and defense of the pre-petition Arbitration.

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

19

**THIRD CLAIM FOR RELIEF**

(For Determination of Non-Dischargeability of Debts under 11 U.S.C. §523(a)(6) - Willful or

Malicious Injury)

101.    Plaintiffs hereby incorporate by reference each and every allegation stated

hereinabove

102.    Defendant engaged in the wrongful conduct described herein willfully and

intentionally even though Defendant knew that his conduct was substantially certain to cause

harm to Plaintiffs.

103.    Defendant's conduct as described herein constituted wrongful conduct which

Defendant did intentionally and which Defendant knew would necessarily cause injury to

Plaintiffs.

104.    Defendant had no just cause or excuse for engaging in the activities that he did

during the time of his employment by Plaintiffs, despite the wrongful nature of those activities

and defendant's knowledge of their wrongfulness.

105.    As a direct and proximate result of the foregoing, Plaintiffs have suffered damages

in an amount not presently ascertained at trial, but believed to be in excess of $1,000,000.

106.    Plaintiffs therefore seek an order under 11 U.S.C. §523(a)(6): (1) determining that:

(i) Defendant is liable to Plaintiffs in an amount to be proved at trial herein; (ii) said liability is

non-dischargeable; and (2) awarding attorneys' fees and costs incurred by Plaintiffs in connection

with the prosecution and defense of the pre-petition arbitration.

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1.      For damages according to proof at trial;

2.      For a decree determining that all debts determined to be owing by Defendant to Plaintiffs which are the subject of this action are deemed and adjudicated to be non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A) and/or §523(a)(4) and/or §523(a)(6);

3.      Attorneys fees incurred pre-petition according to proof;

4.      For costs of suit incurred herein; and

5.      For such other and further relief as this Court deems just and appropriate.

DATED this 7th day of July, 2016.

GREENE INFUSO, LLP
   /s/ James D. Greene
James D. Greene, Esq.
Nevada Bar No. 2647
3030 South Jones Boulevard, Suite 101
Las Vegas, Nevada 89146

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

**GREENE INFUSO, LLP**
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF SERVICE</u>

I am employed by the law firm of Greene Infuso, LLP in Clark County.  I am over the age of 18 and not a party to this action. My business address is 3030 South Jones Boulevard, Suite 101, Las Vegas, Nevada 89146.

On July 7th, 2016 I served the document(s), described as:

**SECOND AMENDED COMPLAINT BY CREDITORS EXCELSIOR MEDIA CORP., AND LIBERTY MEDIA HOLDINGS, LLC TO DETERMINE NON-DISCHARGEABILITY OF DEBTS**

☒  by placing the ☐ original ☒ a true copy thereof enclosed in a sealed envelope addressed as follows

☐ a.  ECF System *(You must attach the "Notice of Electronic Filing", or list all persons and addresses and attach additional paper if necessary)*

☒ b.  BY U.S. MAIL. I deposited such envelope in the mail at Las Vegas, Nevada.  The envelope(s) were mailed with postage thereon fully prepaid.

Zachariah Larson, Esq.
Matthew Zirzow, Esq.
LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101

I am readily familiar with Greene Infuso, LLP.'s practice of collection and processing correspondence for mailing.  Under that practice, documents are deposited with the U.S. Postal Service on the same day which is stated in the proof of service, with postage fully prepaid at Las Vegas, Nevada in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date stated in this proof of service.

☐ c.  BY PERSONAL SERVICE.

☐ d.  BY DIRECT EMAIL

☐ e.  BY FACSIMILE TRANSMISSION

I declare under penalty of perjury that the foregoing is true and correct.

Dated, this 7th day of July, 2016

/s/ Frances M. Ritchie
An employee of Greene Infuso, LLP

**GREENE INFUSO, LLP**
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000